UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ASHAN FERNANDO and MEGAN FERNANDO,
    Plaintiffs,

    v.                               CIVIL ACTION NO.
                                   18-10504-MBB

FEDERAL INSURANCE CO., et al.
    Defendants.

**MEMORANDUM AND ORDER RE:**
**DEFENDANT/COUNTERCLAIMANT FEDERAL INSURANCE COMPANY'S**
**MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 51)**

**March 14, 2022**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment filed by defendant and counterclaimant Federal Insurance Company ("defendant" or "Federal"). (Docket Entry # 51). Plaintiffs and defendants-in-counterclaim Ashan Fernando ("Mr. Fernando") and Megan Fernando ("Mrs. Fernando") (collectively, "plaintiffs") oppose the motion. (Docket Entry # 62). After conducting a hearing on the motion (Docket Entry # 51), this court took the motion under advisement. (Docket Entry # 67).

PROCEDURAL BACKGROUND

Plaintiffs initiated this action against Federal and "Chubb Group of Insurance Companies d/b/a Chubb Personal Insurance d/b/a Chubb Masterpiece Insurance" (the "Chubb Group") on March 16, 2018. (Docket Entry # 1, p. 1). The amended complaint,

filed on July 31, 2019 (the "complaint"), lists as defendants:
The Chubb Corporation, Chubb National Insurance Company, Chubb
Insurance Company of New Jersey (collectively, the "Chubb
Group"), and Federal.  (Docket Entry # 28, p. 1).  The complaint
alleges three counts: breach of contract; breach of the implied
covenant of good faith and fair dealing; and unfair and
deceptive acts and practices in violation of Massachusetts
General Laws Chapter 93A, Section 11 ("Chapter 93A") and Chapter
176D ("Chapter 176D").  (Docket Entry # 28, pp. 7-10).  On
August 14, 2019, Federal filed an answer to the complaint with
counterclaims, alleging fraud and intentional misrepresentation
against plaintiffs and requesting equitable relief based on
judicial estoppel and a declaratory judgment from this court.[1]
(Docket Entry # 29, pp. 1, 16-21).

On December 6, 2019, plaintiffs filed a stipulation of
voluntary dismissal without prejudice of the Chubb Group,
leaving Federal as the only remaining named defendant in this
case.  (Docket Entry # 39).

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "'to pierce the boilerplate of
the pleadings and assay the parties' proof in order to determine

---

[1]  Defendant also asserts judicial estoppel as its thirteenth
affirmative defense.  (Docket Entry # 54-8, p. 10) (Docket Entry
# 29, p. 9).

whether trial is actually required.'"  Tobin v. Federal Express
Corp., 775 F.3d 448, 450 (1st Cir. 2014) (quoting Wynne v. Tufts
Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)).  It is
appropriate "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a).  It is
inappropriate, in contrast, "if the record is sufficiently open-
ended to permit a rational factfinder to resolve a material
factual dispute in favor of either side." Pierce v. Cotuit Fire
Dist., 741 F.3d 295, 301 (1st Cir. 2014).  "An issue is
'genuine' when a rational factfinder could resolve it [in]
either direction," and a "fact is 'material' when its
(non)existence could change a case's outcome." Mu v. Omni
Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018).

In evaluating a motion for summary judgment, "[t]he court
must examine the 'record in the light most favorable to the
nonmovant' and must make 'all reasonable inferences in that
party's favor.'" Garcia-Garcia v. Costco Wholesale Corp., 878
F.3d 411, 417 (1st Cir. 2017) (quoting Ameen v. Amphenol Printed
Circuits, Inc., 777 F.3d 63, 68 (1st Cir. 2015)).  However,
"[a]t the summary judgment stage, facts must be viewed in the
light most favorable to the nonmoving party only if there is a
'genuine' dispute as to those facts." Scott v. Harris, 550 U.S.
372, 380 (2007) (quoting Fed. R. Civ. P. 56(c)).  "'Where the

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Scott, 550 U.S. at 380 (citation omitted).  Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  Id. (rejecting plaintiff's account of high-speed chase because his depiction of a mild and generally safe pursuit was "blatantly contradicted" by video footage).

   "To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the court] to specific evidence in the record that would be admissible at trial."  Ocasio-Hernandez v. Fortuno-Burset, 777 F.3d 1, 4-5 (1st Cir. 2015); see also Fed. R. Civ. P. 56 advisory committee notes ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").  "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'"  Ocasio-Hernandez, 777 F.3d at 4-5 (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)).  "[I]f the summary judgment record satisfactorily

demonstrates that the plaintiff's case is, and may be expected to remain, deficient in vital evidentiary support, this may suffice to show that the movant has met its initial burden." Carmona, 215 F.3d at 133.  Once the moving party has "demonstrate[d] the absence of any genuine issue of material fact," "the burden shifts to the nonmoving party, who must, with respect to each issue on which [he or] she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [his or] her favor." Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  A party opposing summary judgment "may object that the material cited [by the movant] to support . . . a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

"A party asserting that a fact cannot be or is genuinely disputed [may] support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "[A]ffidavits and deposition testimony are effective in [supporting or] opposing summary judgment only when they are given on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or deponent (as the case may be) is competent to testify about the matter in question." Hannon

v. Beard, 645 F.3d 45, 49 (1st Cir. 2011); see also Fed. R. Civ.
P. 56 ("An affidavit or declaration used to support or oppose a
motion must be made on personal knowledge, set out facts that
would be admissible in evidence, and show that the affiant or
declarant is competent to testify on the matters stated.").

Uncontroverted statements of fact in a L.R. 56.1 statement
of material facts comprise part of the summary judgment record.
See L.R. 56.1; Cochran v. Quest Software, Inc., 328 F.3d 1, 12
(1st Cir. 2003) (admitting a date on summary judgment because
plaintiff failed to contest date in L.R. 56.1 statement);
Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st
Cir. 2003) (citing L.R. 56.1 and admitting undisputed material
facts that plaintiff failed to controvert).  Defendant filed a
L.R. 56.1 statement of material facts (Docket Entry # 53), to
which plaintiffs filed a response (Docket Entry # 64).

### FACTUAL BACKGROUND[2]

Viewing the "'record in the light most favorable to'"
plaintiffs, the facts in this case are as follows.  See Garcia-

---

[2]  Docket Entries 54-9, 54-10, 54-45, and 54-46 are transcripts
of examination-under-oath testimony.  See (Docket Entry ## 54-9,
54-10, 54-45, 54-46).  Docket Entries 54-23, 54-24, 54-33, 54-
34, 54-38, 54-39, and 54-48 are transcripts of deposition
testimony.  See (54-22, 54-23, 54-24, 54-30, 54-33, 54-34, 54-
38, 54-39, 54-44, and 54-48).  This court refers to those
examination-under-oath and deposition testimony using the
transcripts' marked page numbers, rather than the docket
entries' page numbers.

Garcia, 878 F.3d at 417 (citation omitted).

I.   The Parties and the Federal Policy

Plaintiffs have been married since August 2012 and, as of March 18, 2016, live in Berkley, Massachusetts with their two children; Mr. Fernando's adult sister, Ashini Fernando; and Mr. Fernando's parents, Ira and Neville Fernando.  (Docket Entry # 54-1, ¶¶ 1-2) (Docket Entry # 54-2, p. 6) (Docket Entry # 54-5, p. 6) (Docket Entry # 54-12, p. 5) (Docket Entry # 54-15, pp. 4-5) (Docket Entry # 54-17, p. 17).  In 2011, the year of their engagement, both plaintiffs and Mr. Fernando's parents filed for bankruptcy.[3]  (Docket Entry # 54-2, p. 10) (Docket Entry ## 54-52, 54-53, 54-54).

From October 28, 2015 through October 28, 2016, plaintiffs were insured under a homeowner's insurance policy issued by Arbella Indemnity Insurance Company, Inc. ("Arbella").  (Docket Entry # 54-35, p. 2).  That policy (the "Arbella policy") scheduled an engagement ring and band, collectively insured for $26,800.  (Docket Entry # 54-35, pp. 3-4).  Maria Delgado ("Delgado") from Arbella was plaintiff's insurance agent.

---

[3]  Plaintiffs object to the admissibility of their bankruptcy filings, as well as those of Mr. Fernando's parents.  (Docket Entry # 63, p. 14); see (Docket Entry ## 54-52, 54-53, 54-54) (bankruptcy filings).  As further detailed below in the Discussion section, this court finds the bankruptcy filings admissible.

(Docket Entry # 54-2, p. 19) (Docket Entry # 54-3, p. 15)
(Docket Entry # 54-33, p. 193).

From December 11, 2015 through December 11, 2016,
plaintiffs were also insured under an insurance policy issued by
defendant, policy number 14465494-01 (the "Federal policy"),
that provided "coverage against physical loss" if certain
jewelry described therein became "lost, damaged, or destroyed."
(Docket Entry # 54-4, p. 4).  To procure the Federal policy,
plaintiffs submitted to defendant appraisals for the jewelry
scheduled therein (the "appraisals").  (Docket Entry # 54-40);
see (Docket Entry # 54-9, pp. 93-94) (Docket Entry # 54-22, p.
341).  The appraisals bear the signature of "David Youshaie" and
appear on two different letterheads, "Paz Jewlery [sic]" and
"Victoria Jewelry," which are listed under the same address at
43 Temple Street in Boston, Massachusetts.  (Docket Entry # 54-
40, pp. 2-25).  According to plaintiffs, "Amir 'David' Youshaie,
the owner of Victoria Jewelry" ("Amir Youshaie")," performed the
appraisals.[4]  (Docket Entry # 63, p. 9).

---

[4]  The parties dispute whether Amir Youshaie or "David 'Shabab'
Youshaie" ("David Youshaie") conducted the appraisals.  (Docket
Entry # 63, p. 9); see (Docket Entry # 52, p. 12) (Docket Entry
# 64, pp. 9, 14).  "Plaintiffs agree that there are two
individuals with the name David Youshaie, including one who
plead to criminal charges in 2014" but maintain that "said
'David' . . . does not work at Victoria" Jewelry.  (Docket Entry
# 64, pp. 13-14, ¶ 126).

When the Federal policy was originally issued, it listed the following four jewelry items with their appraised values: a men's ring ($64,30), a women's ring ($71,500); a women's engagement ring ($26,800); and a Rolex watch ($34,000).  (Docket Entry # 54-4, p. 10).  On February 2, 2016, plaintiffs added two additional jewelry items and their appraised values: a women's diamond ring ($159,360) and a white gold tennis bracelet ($113,600).  (Docket Entry # 54-5, p. 20) (Docket Entry # 54-8, pp. 57-58).  With these additions, the Federal policy "provided coverage for itemized jewelry valued at $469,560."  (Docket Entry # 53, ¶ 86); see (Docket Entry # 54-8, p. 57).  Stephanie Fairley ("Fairley") was plaintiffs' insurance agent for the Federal policy.  (Docket Entry # 54-2, p. 20) (Docket Entry # 54-16, p. 16).

Coverage under the Federal policy is subject to several conditions, two of which are at issue in this case: (1) "[c]oncealment and [f]raud" and (2) "[d]uties after a loss." See (Docket Entry # 54-4, pp. 20, 24).  The "[c]oncealment and [f]raud" clause repudiates coverage "if . . . any covered person has intentionally concealed or misrepresented any material fact relating to th[e] [Federal] policy before or after a loss." (Docket Entry # 54-4, p. 20).  The "[d]uties after a loss" clause" provides that, following a loss, plaintiffs must: (1) "immediately notify" defendant and the police of the loss; (2)

"take all reasonable means that are necessary to" prevent
"further loss or damage"; (3) "prepare an inventory of damaged
personal property, describing the property in full" and
attaching "bills, receipts and other documents when available to
support [the] inventory"; (4) show defendant, upon request, any
damaged property insured under the [Federal] policy; and (5)
"submit to [defendant], within 60 days of [defendant's] request,
[plaintiffs'] signed, sworn proof of loss which documents to the
best of [their] knowledge and belief: the time and cause of
loss; [their] interest and the interest of all other in the
property involved and all liens on the property; other insurance
which may cover the loss; changes in the title or occupancy of
the property during the [Federal] policy term."  (Docket Entry #
54-4, pp. 22-23).  The "[d]uties after a loss" clause also
reserves defendant's "right to examine separately under oath."
(Docket Entry # 54-4, p. 23).

II.  The Reported Theft of Plaintiffs' Jewelry

     On March 18, 2016, plaintiffs left their home between 6:30
and 7:00 p.m. to drop off their two children at the home of Mrs.
Fernando's sister in Taunton, Massachusetts, before traveling to
Providence, Rhode Island to play paintball.  (Docket Entry # 54-
9, pp. 99-100, 103) (Docket Entry # 54-10, pp. 24-26, 28).
Plaintiffs played paintball for approximately 45 to 60 minutes
and then stopped for dinner in Warwick, Rhode Island.  (Docket

Entry # 54-9 at pp. 104-06) (Docket Entry # 54-10, pp. 28, 30-
31).  After dinner, they picked up one of their sons (and left
the other so that he could remain sleeping) in Taunton and
returned home between 11:30 p.m. and midnight.  (Docket Entry #
54-9, pp. 109-11) (Docket Entry # 54-10, pp. 34-35, 39) (Docket
Entry # 54-12, p. 14).  Approximately 15 to 30 minutes later,
plaintiffs discovered that one of their bedroom windows had been
shattered and that their bedroom safe, which contained their
jewelry, was missing.  (Docket Entry # 54-9, pp. 114-19) (Docket
Entry # 54-10, pp. 39-40, 44).  Mr. Fernando called his handyman
and friend, Eustace Ben Leitch ("Leitch"), to tell him about the
break-in and seek his advice as to how to cover the broken
bedroom window.  (Docket Entry # 54-2, p. 12) (Docket Entry #
54-3, p. 10) (Docket Entry # 54-9, pp. 51-12) (Docket Entry #
54-16, p. 36) (Docket Entry # 54-17, p. 21).  Mr. Fernando also
spoke with Joseph Spencer ("Spencer"), who he knows "from the
gym," during a call at approximately 12:39 a.m.  (Docket Entry #
54-9, pp. 158-159) (Docket Entry # 53-29).

The following afternoon, plaintiffs called the Berkley
Police Department to report the break-in and theft of the safe
(the "burglary").[5]  (Docket Entry # 54-9, pp. 175-77) (Docket

---

[5]  Plaintiffs did not report the burglary the night prior because
Mr. Fernando "was drunk" and "scared" to contact the police in
his intoxicated state, particularly because he is "a man of

Entry # 54-11).  The Berkley Police Department's incident report lists seven jewelry items reported stolen from the safe with a total appraised value of $634,060.  (Docket Entry # 54-11, pp. 2-4).  Six of the seven jewelry items reported stolen were scheduled on the Federal policy.[6]  (Docket Entry # 54-5, p. 19); see (Docket Entry # 54-4, pp. 1, 10) (Docket Entry # 54-8, p. 57) (Docket Entry # 54-11, pp. 2-4).  The seventh item, "a woman's tennis bracelet [] appraised at $164,500 . . . was never scheduled on the Federal [p]olicy."  (Docket Entry # 54-5, p. 20).  The incident report indicates that the appraised value "of the items originated from the appraisals done by Victoria Jewelry[,] 43 Temple Place[,] Boston[,] M[A,] 02111" in 2015.[7]  (Docket Entry # 54-11, p. 4); see (Docket Entry # 54-40) (Victoria Jewelry appraisals).

Mr. Fernando subsequently filed a "statement of claim" with Arbella to report the burglary and the missing safe.  (Docket Entry # 54-36).  In or about May 2016, Arbella contracted Terry Seger ("Seger") from TM Seger Claim Services, Inc. to investigate Mr. Fernando's claim under the Arbella policy.

---

color" (Docket Entry # 54-17, p. 20) who has had "bad experiences with police" (Docket Entry # 54-22, pp. 540-42).
[6]  Mrs. Fernando's engagement ring was scheduled on both the Arbella policy and the Federal policy.  (Docket Entry # 54-4, pp. 2, 10) (Docket Entry # 35, pp. 2, 4).
[7]  Mr. Fernando provided the Berkley Police Department with copies of the appraisals.  (Docket Entry # 54-9, p. 178).

(Docket Entry # 54-38, pp. 6-7, 12-13) (Docket Entry # 54-39, pp. 12-13).  Steven Fuller ("Fuller"), an investigator from the special investigations unit ("SIU") of Arbella, also reviewed Mr. Fernando's claim.  (Docket Entry # 54-39, pp. 8, 11-12).  On or about August 2, 2016, Arbella denied Mr. Fernando's claim on the basis that he had not appeared for an "examination under oath that was scheduled for [him] on July 8, 2016," which Arbella noted was "a material breach of the" Arbella policy. (Docket Entry # 54-37); see (Docket Entry # 54-39, pp. 14-15).

III. The Claim and Defendant's Investigation

On March 19, 2016, plaintiffs submitted a "property loss notice" ("the claim" or "plaintiffs' claim") to defendant for the jewelry they reported stolen in the burglary (the "loss").[8]

---

[8]  Pursuant to Local Rule 56.1, "[m]aterial facts of record" in a moving party's statement of facts are "deemed for purposes of the motion [for summary judgment] to be admitted by [the] opposing part[y] unless controverted by the" opposing party's statement.  L.R. 56.1.  Plaintiffs do not dispute that that the total appraised value of the reported stolen jewelry was $634,060.  See (Docket Entry # 53, p. 7, ¶ 29) ("[A]ppraisals for the allegedly stolen jewelry items, totaling $634,060, were attached to the police report."); (Docket Entry # 53, ¶ 225); (Docket Entry # 64, p. 3, ¶ 29) ("The Police Report speaks for itself.  Disputed in so much as the Defendant's characterization of the items being 'allegedly stolen.'").  However, plaintiffs also admit that the sworn statement in proof of loss they submitted to defendant seeks $636,060 in coverage.  (Docket Entry # 54-56) (plaintiffs' sworn statement in proof of loss); (Docket Entry # 64, p. 22, ¶ 225) (plaintiffs' response to defendant's L.R. 56.1 statement of material facts) ("Exhibit 56 speaks for itself.").  For the purposes of defendant's motion for summary judgment (Docket Entry # 51) and this memorandum and

(Docket Entry # 54-2, p. 12) (Docket Entry # 54-3, p. 11) (Docket Entry # 54-5, p. 17) (Docket Entry # 54-14).  On or about March 21, 2016, defendant assigned Jacquelyn Rider ("Rider"), one of its SIU investigators, to investigate the loss and plaintiffs' claim.  (Docket Entry # 54-5, p. 4) (Docket Entry # 54-12, p. 2) (Docket Entry # 54-13) (Docket Entry # 54-31).  Rider subsequently prepared at least two SIU reports concerning her investigation.  (Docket Entry ## 54-12, 54-31).

On March 21, 2016, claim examiner Brittany Mahig interviewed Mr. Fernando to obtain a "recorded claims statement."  (Docket Entry # 54-15, p. 2); see (Docket Entry # 54-2, p. 16).  When asked about the provenance of the jewelry reported stolen, Mr. Fernando explained that the jewelry (with the exception of Mrs. Fernando's engagement ring) had been gifts from his parents and that they had likely bought the jewelry in Ethiopia or Sri Lanka.  (Docket Entry # 54-15, pp. 15-16).  He stated that he purchased the engagement ring for Mrs. Fernando in 2012.  (Docket Entry # 54-15, p. 15).

On or about March 22, 2016, Fairley, plaintiffs' insurance agent for the Federal policy, contacted defendant to discuss obtaining coverage for a seventh item, a diamond tennis bracelet, "valued at $165,000."  (Docket Entry ## 54-18, 54-19).

---

order, however, the exact amount of coverage plaintiffs seek is not material.

Fairley explained that she had forgotten to add the bracelet to the Federal policy when she added additional two additional items on February 2, 2016.  (Docket Entry # 54-18).  Kim Aumick from defendant advised Fairley that defendant "would allow [coverage] for the bracelet under [the Federal policy's] newly acquired articles coverage, which is up to 25% of the total scheduled value, in this case $117,390."  (Docket Entry # 54-19).  After speaking with plaintiffs, Fairley told defendant that plaintiffs were "okay" with the limited coverage of the bracelet.  (Docket Entry # 54-18).

Rider conducted recorded interviews of Mr. Fernando on March 28, 2016 (Docket Entry # 54-16, p. 2) and Mrs. Fernando on March 30, 2016 (Docket Entry # 54-17, p. 2).  Mr. Fernando stated that he purchased Mrs. Fernando's engagement ring in New York City's "diamond district" and that the other stolen jewelry had been gifts from his parents and were from Ethiopia or Sri Lanka.  (Docket Entry # 54-16, pp. 43-48) (Docket Entry # 54-33, p. 231).  Mrs. Fernando stated that the stolen jewelry, with the exception of her engagement ring, had been gifted to plaintiffs by Mr. Fernando's parents.  (Docket Entry # 54-17, pp. 23, 30-36).  She also stated that Mr. Fernando had bought her engagement ring in New York ("exactly where" she did not know) (Docket Entry # 54-17, p. 29) and that she was not sure where

Mr. Fernando's parents had obtained the other jewelry (Docket Entry # 54-17, p. 32).

Also on March 30, 2016, defendant inspected and photographed plaintiffs' home (Docket Entry # 54-5, p. 17) and Rider spoke with Sergeant Daniel Mosher ("Sergeant Mosher") from the Berkley Police Department "about [] [p]laintiffs' report of the [l]oss and the status of the police investigation" (Docket Entry # 53, p. 7, ¶ 30); see (Docket Entry # 54-5, p. 18); (Docket Entry # 54-12, pp. 16-17).[9]  According to Rider's reporting, Sergeant Mosher found plaintiffs' claim to be "highly suspect" and "inflated."  (Docket Entry # 54-12, p. 12); see (Docket Entry # 54-12, p. 2).  During her investigation, Rider reviewed the "jewelry appraisals received from" plaintiffs and noted in her report that "[t]here are 2 different types of letterhead between the appraisals received even though they are from the same vendor" and that the appraisals did not "have ay information as to purchase info (ie: when purchased, where purchased from or price when purchased)."  (Docket Entry # 54-12, p. 4).  Rider also reviewed plaintiffs' bankruptcy filings from 2011 and noted

---

[9]  Plaintiffs argue that Rider's investigative reports and Sergeant's Mosher statements to Rider and "what [] Rider surmise[d] [Sergeant] Mosher believed" are inadmissible hearsay. (Docket Entry # 63, p. 3, n. 4).  As further detailed below in the Discussion section, this court finds the investigative reports and statements therein purportedly made by Sergeant Mosher admissible.

that plaintiffs "denied any real property, including jewelry," in

those filings.  (Docket Entry # 54-12, p. 5).

   On or about June 6, 2016, plaintiffs submitted a "sworn

statement in proof of loss" (the "proof of loss") to defendant

in support of the claim.  (Docket Entry # 54-55) (Docket Entry #

54-56).  The proof of loss contained the following statement:

> The said loss did not originate by any act, design or
> procurement on the part of your insured, or this affiant;
> nothing has been done by or with the privity or consent
> of  your  insured  or  this  affiant,  to  violate  the
> conditions of the [Federal] policy, or render it void;
> no articles are mentioned herein or in annexed schedules
> but  such  as  were  destroyed  or  damaged  at  the  time  of
> said loss;  no property saved has in any manner been
> concealed, and no attempt to deceive the said company,
> as to the extent of said loss, has in any manner been
> made. Any other information that may be required will be
> furnished and considered a part of this proof.

(Docket Entry # 54-56).

   Defendant conducted examinations under oath of Mr. Fernando

(Docket Entry # 54-9) and Mrs. Fernando (Docket Entry # 54-10)

on May 25, 2016, as well as Mr. Fernando's father (Docket Entry

# 54-45, p. 1) and mother (Docket Entry # 54-46, p. 1) on July

27, 2016.  Mr. Fernando testified, inter alia, that: his father

told him that the stolen jewelry (excluding Mrs. Fernando's

engagement ring) had been a gift from friends and family during

his father's trip to Sri Lanka in 2014 (Docket Entry # 54-9, p.

214); his father first gifted him the Rolex watch in a white bag

with a lion emblem (Docket Entry # 54-9, pp. 79-82) and later,

on a separate occasion, gifted him the remainder of the jewelry "neatly placed" in a black briefcase (Docket Entry # 54-9, pp. 204-209); he bought Mrs. Fernando's engagement ring in March 2011 in New York City's "diamond district" (but did not "remember the name of the shop") for $24,000 in cash (Docket Entry # 54-9, pp. 65-68); and he borrowed $2,000 from a friend and $23,000 from his parents to purchase the engagement ring. (Docket Entry # 54-9, pp. 69-71).

Mr. Fernando's father, Neville Fernando, testified that the six pieces of jewelry he subsequently gifted Mr. Fernando had been initially gifted to him in a dark brown cloth by relatives, including Pearlin Fernando, in Sri Lanka in 2014.[10]  (Docket Entry # 54-5, pp. 33-35, 37-40, 43).  He denied having any documents "relating in any way to the gift[ing] or purchase of the jewelry," including customs forms declaring the jewelry upon his return to the United States.  (Docket Entry # 54-45, pp. 8-10).  He also testified that he gifted all of the jewelry on one occasion to Mr. Fernando about one or two months before December 4, 2015 and that he told Mr. Fernando the jewelry was a gift from relatives and friends from Sri Lanka.  (Docket Entry # 54-45, pp. 67-68, 73).

---

[10]  At his deposition in October 2019, Neville Fernando testified that he has since learned that Pearlin Fernando is deceased. (Docket Entry # 54-94, pp. 93-97).

On September 8, 2016, plaintiffs provided defendant with contact information for certain relatives in Sri Lanka.  (Docket Entry # 54-28).  "Federal retained CoventBridge to locate and validate the" relatives.  (Docket Entry # 54-50).[11]

IV.  Plaintiff's Formal Demands and
     Defendant's Denial of the Claim

By letter dated April 20, 2016, plaintiffs sent Chubb Personal Insurance[12] a "formal demand for relief pursuant to" Chapter 93A and Chapter 176D.  (Docket Entry # 54-60).  Plaintiffs alleged that Chubb Personal Insurance "ha[d] violated the provisions of" Chapter 93A and Chapter 176D "in the course of investigating [] [plaintiffs'] claim by failing to make a

---

[11]  Plaintiffs object to the admissibility of CoventBridge's findings in its investigative report (Docket Entry # 54-50). (Docket Entry # 64, pp. 18-19, ¶¶ 176-82, 187).  According to defendant, CoventBridge was unable to locate three of the relatives and, after conferring with a "local village officer," was able to locate an address for the fourth relative who informed CoventBridge that she had no knowledge of the jewelry at issue.  (Docket Entry # 54-50).  However, as further detailed below, this court finds CoventBridge's report (Docket Entry # 54-50) to be inadmissible and therefore does not consider the report for the purposes of summary judgment.

[12]  As noted previously, this action initially involved not only Federal but also The Chubb Corporation, Chubb National Insurance Company, and Chubb Insurance Company of New Jersey.  (Docket Entry # 28, p. 1) (Docket Entry # 54-1, p. 2).  According to defendant, The Chubb Corporation is Federal's parent company, and Chubb National Insurance Company and Chubb Insurance Company of New Jersey are Federal's subsidiary companies.  (Docket Entry # 28, p. 2, ¶¶ 5-8) (Docket Entry # 54-1, p. 3, ¶¶ 5-8).  These three former defendants "operate under the business names of Chubb Group of Insurance Companies, Chubb Personal Insurance and Chubb Masterpiece Insurance."  (Docket Entry # 28, p. 2, ¶ 8) (Docket Entry # 54-1, p. 3, ¶ 8).

timely reasonable offer of settlement despite both liability and damages being reasonably clear for th[e] claim." (Docket Entry # 54-60).

By letter dated January 20, 2017, defendant notified plaintiffs that it had denied the claim. (Docket Entry # 54-55). Defendant explained that it determined that plaintiffs, Neville Fernando, and Ira Fernando (Mr. Fernando's mother) "made false statements and concealed and misrepresented material facts made in support of [the] claim" to defendant's investigator, "in the initial loss notice," "during [plaintiffs'] examinations under oath[,] and during the claim investigation." (Docket Entry # 54-55). As such, defendant concluded that plaintiffs had violated the "[c]oncealment or fraud" and "[d]uties after a loss" provisions of the Federal policy. (Docket Entry # 54-55). Defendant denied plaintiffs' claim on this basis and also because plaintiffs were "judicially estopped from making a claim for" Mrs. Fernando's engagement ring "since it was not disclosed on [plaintiffs'] bankruptcy petition filed and discharged in 2011." (Docket Entry # 54-55) (capitalization altered); see (Docket Entry # 54-52) (Mr. Fernando's January 31, 2011 bankruptcy filing). On or about February 10, 2017, in response to a letter from plaintiffs dated February 1, 2017, defendant set forth the specific findings from its investigation supporting its denial of the claim. (Docket Entry # 54-57).

On or about September 1, 2017, plaintiffs sent defendant a second formal demand for relief pursuant to Chapter 93A and Chapter 176D.  (Docket Entry # 54-59).  They disputed defendant's denial of the claim, explaining that plaintiffs had proven "ownership of the [i]nsured [j]ewelry, procurement of appraisals, procurement of the [Federal] [p]olicy and theft of the [i]nsured [j]ewelry."  (Docket Entry # 54-59, p. 3).

V.   Depositions and Affidavits

Defendant has deposed several individuals in this matter: Mr. Fernando on September 13, 2019 (Docket Entry # 54-33, pp. 2-4) and September 20, 2019 (Docket Entry # 54-22, pp. 274-76); Mr. Fernando's father, Neville Fernando, on October 19, 2019 (Docket Entry # 54-48, pp. 2-4); Delgado (plaintiffs' insurance agent with Arbella) on November 21, 2019 (Docket Entry # 54-34, pp. 2-4); Fuller (Arbella's SIU investigator) on November 21, 2019 (Docket Entry # 54-39, pp. 2-5); Seger (Arbella's contracted investigator) on December 11, 2019 (Docket Entry # 54-38, pp. 2-4); Mrs. Fernando on December 13, 2019 (Docket Entry # 54-23, p. 1); Amy Chaves, Mrs. Fernando's sister, on February 4, 2020 (Docket Entry # 54-24, p. 1); Leitch (Mr. Fernando's handyman and friend) on February 4, 2020 (Docket Entry # 54-30, p. 1); and Amir Youshaie (the jewelry appraiser, according to plaintiffs) on February 19, 2020 (Docket Entry # 54-44, pp. 2-4).

On or about February 25, 2020, Spencer submitted an
affidavit admitting that he recalled speaking with Mr. Fernando
over the phone "on occasion" in March 2016 but denying any
knowledge of the burglary or "knowledge from any source
regarding [Mr.] Fernando's ownership of any jewelry ever gifted
to him by his father, Neville Fernando."  (Docket Entry # 54-32,
pp. 2, 3-4).  Upon review of Mr. Fernando's phone records, he
did "not recall the substance, general or specific, of [the]
phone call" he had with Mr. Fernando on March 19, 2016.  (Docket
Entry # 54-32, p. 2).

<u>DISCUSSION</u>

Defendant moves for summary judgment pursuant to Fed. R.
Civ. P. 56 and Local Rule 56.1, seeking the dismissal of the
complaint as well as "entry of judgment in its favor on its
counterclaims."  (Docket Entry # 52, p. 1).  Defendant "seeks
summary judgment on the grounds that [its] investigation of []
[p]laintiffs' claimed loss was warranted, reasonable and
conducted in good faith, and [its] denial of the claim was based
on the results of that investigation and the terms of [the
Federal] policy."  (Docket Entry # 52, pp. 1-2).  More
specifically, defendant argues that: (1) because plaintiffs had
violated the Federal policy's "[c]oncealment of [f]raud" and
"duties after a loss" clauses, defendant was entitled to deny
the claim and therefore did not engage in a breach of contract

(Docket Entry # 52, p. 1);[13] (2) defendant did not "breach [] the implied covenant of good faith and fair dealing" because it "'conducted a thorough investigation; adhered to proper SIU protocols, encouraged and allowed [] [plaintiffs] to provide any and all evidence in support of their claim; and reached [its] conclusion to deny the claim only after an exhaustive, fair, and good faith investigation'" (Docket Entry # 52, p. 36) (citation omitted); and (3) plaintiffs "cannot prevail on" their Chapter 93A and Chapter 176D claim because they "have not disclosed an expert to offer an opinion that Federal's investigation and denial of the [c]laim was in breach of any duty owed to [] [p]laintiffs" and "rose to the level of violating" Chapter 93A or Chapter 176D (Docket Entry # 52, pp. 37-38).

Plaintiffs deny that summary judgment is appropriate at this stage because: (1) numerous issues of material fact remain; (2) defendant's statement of material facts uses inadmissible hearsay evidence and expert opinions; and (3) plaintiffs complied with their obligations under the Federal policy following the loss.[14]

---

[13]  Under Massachusetts law, the insured (here, plaintiffs) bears "the initial burden of proving that a loss falls within the policy's description of covered risks." New Fed Mortg. Corp. v. National Union Fire Ins. Co. of Pittsburgh, PA, 543 F.3d 7, 11 (1st Cir. 2008).  "It is the insurer's burden [here, defendant's] to show the applicability of a particular exclusion." Id.

[14]  As further detailed below, this court finds that that there are genuine issues of material fact precluding summary judgment. This court does not therefore also evaluate whether summary

(Docket Entry # 63) (Docket Entry # 64, ¶¶ 62, 202, 242).  In its
reply to plaintiffs' opposition, defendant counters that
"[p]laintiffs set forth no substantive or competent evidence
rebutting Federal's motion [for summary judgment] as is required
to defeat summary judgment," and instead "litter their
[opposition] and [response to defendant's statement of facts]
with unfounded and improper evidentiary objections in an attempt
to convince this Court that there are genuine issues of fact
preventing summary judgment, where none exist."  (Docket Entry #
65, p. 4).

I.   <u>Whether There Are Genuine Issues of Material Fact</u>

Among the purportedly "genuine issue[s] of material fact"
cited by plaintiffs are the following: "[w]hether or not a
burglary occurred at [] [p]laintiffs' home, resulting in a
covered [l]oss" (Docket Entry # 63, pp. 2-3); the proper "weight"
attributable to plaintiffs' procurement of the Federal policy
"through an agency out of state," "'despite 'Chubb' having local
Massachusetts based agents'" (Docket Entry # 63, p. 8) (citing
Docket Entry # 52, p. 11); "who[] conducted the [a]ppraisals" of
the jewelry (Docket Entry # 63, p. 9); the accuracy and
reliability "of the [a]ppraisals and opinions of [d]efendant's
[e]xpert, [] DePrisco" (Docket Entry # 63, p. 12); "precisely

_____

judgment is inappropriate on the basis that plaintiffs complied
with the Federal Policy.

how" Mr. Fernando's father "gave the jewelry to [Mr. Fernando]"
(Docket Entry # 63, p. 13) (emphasis omitted); whether Mrs.
Fernando's engagement ring "should have been included in the
[Federal] [p]olicy based upon [plaintiffs'] prior bankruptcies
and what [] that mean[s] in terms of the procurement of the
[Federal] [p]olicy" (Docket Entry # 63, p. 14); whether
plaintiffs harbored the requisite intent for "[d]efendant's
counterclaim of fraud" (Docket Entry # 63, pp. 14-15); and
"[w]hether or not Federal's denial of the claim was 'reasonable'"
and its "investigation thereof [] 'conducted in good faith'"
(Docket Entry # 63, p. 15).[15]

Rather than attempt to rebut the materiality or genuineness
of these issues, defendant generally denies that there are
genuine issues of material fact (Docket Entry # 65, pp. 1, 4)
and instead points to which facts plaintiffs have admitted
(Docket Entry # 65, p. 20).  As the party moving for summary
judgment, defendant bears the burden of "demonstrat[ing] the

---

[15]  Plaintiffs also argue that "whether or not [] [Mr. Fernando]
told a non-party [Leitch] about the break-in" is a question of
fact that "must be determined by a jury."  (Docket Entry # 63).
However, in the same paragraph, plaintiffs also argue that
whether or not Mr. Fernando "was required to detail to his
property manager [Leitch] what was stolen from his home the
night of the [l]oss . . . is immaterial and certainly not
notable for purposes of a [s]ummary [j]udgment."  (Docket Entry
# 63, p. 7).  This court therefore does not consider that issue
of fact to be material.

absence of any genuine issue of material fact."[16]  Borges, 605
F.3d at 5.  Defendant has failed to meet its burden.

As to the various "genuine issues of material fact" cited
by plaintiffs, this court begins with the most obvious: whether
or not a burglary actually occurred.  See (Docket Entry # 63, pp.
2-3).  Plaintiffs, of course, "steadfastly maintain[]" that they
were the victims of a burglary on March 18, 2016.  See (Docket
Entry # 63, pp. 2-3); see also (Docket Entry # 28) (Docket Entry
# 54-1).  Defendant, in turn, suggests that "the burglary [] was
staged," in part because "the alleged burglar conveniently passed
in front of the only security camera capable of recording and
storing video despite its being nowhere near his point of entry
or egress, or the safe he supposedly stole."  (Docket Entry # 52,
p. 24, n. 6).  Defendant has also, in other submissions to this
court, purposely cast suspicion on the underlying circumstances
of plaintiffs' reporting of the burglary and loss.  See, e.g.,
(Docket Entry # 53, pp. 7-8, 11-12, ¶¶ 31-33, 46, 52-53) (Docket
Entry # 65, p. 5); see also (Docket Entry # 54-5) (Docket Entry #
54-12) (Docket Entry # 54-13).  Accordingly, the parties dispute
whether a burglary in fact took place on March 18, 2016.

This issue of fact is "'genuine'" because "a rational

---

[16] As noted previously, "[a]n issue is 'genuine' when a rational
factfinder could resolve it [in] either direction," and a "fact
is 'material' when its (non)existence could change a case's
outcome."  Omni Hotels, 882 F.3d at 5.

factfinder could resolve it [in] either direction" and is
"'material'" because this entire case hinges on whether or not an
actual burglary (and, consequently, loss) occurred that would
trigger defendant's obligation to pay a claim under the Federal
policy.[17]  See Omni Hotels, 882 F.3d at 5; see also Garcia-Garcia,
878 F.3d at 417 (1st Cir. 2017) ("The court must examine the
'record in the light most favorable to the nonmovant [here,
plaintiffs]' . . . ." (citation omitted).  Although defendant has
introduced facts that cast doubt on plaintiffs' assertion that a
burglary occurred (through, for example, Rider's investigation
and her conversations with Sergeant Mosher), the facts are not so
overwhelming that "'the record as a whole could not lead a
rational trier of fact to find for'" plaintiffs.  Compare Scott,
550 U.S. at (2007) (citation omitted) (rejecting plaintiff's
account of high-speed chase because his depiction of a mild and
generally safe pursuit was "blatantly contradicted" by video
footage) with Gaetani v. Hadley, No. CV 14-30057-MGM, 2019 WL
1440405, at *6 (D. Mass. Mar. 29, 2019) (finding that, "much to

---

[17]  As to materiality, defendant does not present the argument
that the occurrence (or nonoccurrence) of the burglary is not
"material" in that, whether or not the burglary occurred,
plaintiffs' failure to provide truthful information after the
*reported* burglary discharged defendant's obligation under the
Federal policy to pay the claim.  Thus, even if the occurrence
(or nonoccurrence) of the burglary is not material here,
defendant has not made such a showing and has failed to meet its
burden on summary judgment.  See Fed. R. Civ. P. 56.

the contrary" of the circumstances in Scott, "there [was] no video footage or other evidence that clearly undermine[d] [p]laintiff's version of events," as a "third-party account corroborate[d] [p]laintiff's testimony"); see also Punsky v. City of Portland, No. 2:19-CV-00235-NT, 2021 WL 5344738, at *7 (D. Me. Nov. 16, 2021) ("[W]here a video recording contradicts facts asserted by the nonmoving party, rather than take as true assertions that no reasonable jury could believe, the facts are to be viewed 'in the light depicted by the videotape.'").

Furthermore, it also clear that the parties dispute who conducted the appraisals.  See (Docket Entry # 52, p. 12) (Docket Entry # 63, p. 9) (Docket Entry # 64, pp. 9, 14).  Plaintiffs claim that Amir Youshaie conducted the appraisals, while defendant alleges that David Youshaie (a convicted felon) performed the appraisals.  (Docket Entry # 52, p. 12) (Docket Entry # 63, p. 9) (Docket Entry # 64, pp. 9, 14) (Docket Entry # 65, p. 9).  According to plaintiffs, this is a "genuine issue of material fact" because defendant argues, in part, that "if [David Youshaie] performed [the appraisals], they were procured [] by fraud and the policy is invalid."  (Docket Entry # 63, p. 10). Defendant does not address in its reply (Docket Entry # 65) whether who conducted the appraisals is a genuine issue of material fact.

For these reasons, summary judgment is inappropriate because

defendant has failed to show that "there is no genuine dispute as

to any material fact" in this case.  Fed. R. Civ. P. 56(a).

II.  Admissibility of Hearsay Statements, Bankruptcy
     Filings, and Defendant's Expert Witness Reports

     A.   Hearsay Statements

     Plaintiffs argue that the following facts introduced by

defendant are hearsay:[18] Sergeant's Mosher statements to Rider and

"what [] Rider surmise[d] [Sergeant] Mosher believed" (Docket

Entry # 63, p. 3, n. 4); Delgado's deposition testimony (Docket

Entry # 54-34, pp. 24-25, 27-31, 67-68) as to her conversations

with Mr. Fernando regarding scheduling certain jewelry on the

Arbella policy and her review of the appraisals (Docket Entry #

53, pp. 18-20, ¶¶ 89, 92, 94-100) (Docket Entry # 63, p. 8, n. 6)

(Docket Entry # 64, p. 18, ¶ 89, ¶ 92); an Arbella investigator's

reference to "'the appraiser's store, Victoria Jewelry, as a 'den

of thieves' based on his knowledge of fraudulent claims coming

from the store in the past" (Docket Entry # 53, p. 22, ¶ 115);

see (Docket Entry # 54-38, pp. 60-61) (Docket Entry # 63, pp. 8-

9) (Docket Entry # 64, p. 12, ¶ 115); the examination-under-oath

and deposition testimonies of Mr. Fernando's parents as to how

Mr. Fernando's father obtained the jewelry and subsequently

_____

[18]  Although this court has determined that summary judgment is
inappropriate because of the existence of genuine issues of
material fact, it will also discuss some of plaintiffs' hearsay
objections, as this court reviewed such purportedly hearsay
statements to determine whether issues of material fact existed.

gifted it to Mr. Fernando and whether they loaned Mr. Fernando money for the purchase of Mrs. Fernando's engagement ring (Docket Entry # 53, pp. 30-31, 32-33, 37, ¶¶ 162-70, 183-86, 188-90, 215) (Docket Entry # 54-45, pp. 37-38, 43-44, 81-82, 84) (Docket Entry # 54-46, pp. 18-20, 27, 41-45) (Docket Entry # 54-48, pp. 18-21, 92, 95-97, 174-75) (Docket Entry # 63, p. 13, n. 7) (Docket Entry # 64, pp. 16-17, 19-20, 22, ¶¶ 163-69, 183, 188-89, 215); and Rider's summary in her SIU report (Docket Entry # 54-12, pp. 19-21) of her conversations with "a male" at "Victoria/Paz Jewelry at 43 Temple Street, Boston, M[A]" who, she noted, "represented himself to be 'David Youshaie' and confirmed [that] he performed the appraisals at issue in this case" (Docket Entry # 53, p. 23, ¶¶ 121-22); see (Docket Entry # 63, p. 17) (Docket Entry # 64, p. 13, ¶¶ 122-25).

In their response (Docket Entry # 64) to defendant's statement of material facts (Docket Entry # 53), plaintiffs also dispute the following as inadmissible hearsay: the deposition testimony of Mrs. Fernando's sister, Amy Chaves (Docket Entry # 54-24, pp. 32-33), that she and Mrs. Fernando "have a 'very close' relationship and speak a few times a week" (Docket Entry # 53, p. 10, ¶ 45); see (Docket Entry # 64, p. 5, ¶ 46); the observation of "Federal's expert, James Whitaker, [that] 'the produced "snapshot" of the security video does not allow for the retrieval of metadata and therefore, it cannot be determined the

actual date or time that the video was recorded'" (Docket Entry # 53, p. 14, ¶ 62) (citing (Docket Entry # 54-27, p. 8)); see (Docket Entry # 64, p. 6, ¶ 62); Rider's reporting as to her unsuccessful attempts "to schedule an interview of [Leitch] to corroborate information provided by [] [p]laintiffs" and that she "contacted [] Spencer who denied knowing [Mr. Fernando], denied any recollection of his March 19, 2016 phone call to [Mr. Fernando] and refused to speak further with Federal" (Docket Entry # 53, pp. 16-17, ¶¶ 76, 79); see (Docket Entry # 54-31, pp. 7-8, 10) (Docket Entry # 64, p. 8, ¶¶ 76, 79); Mr. Fernando's representations "[d]uring his March 28, 2016 recorded statement . . . that people, including his parents, were telling him that he could probably get insurance for the valuable items he had acquired" (Docket Entry # 53, p. 18, ¶ 87); see (Docket Entry # 54-16, p. 51) (Docket Entry # 64, p. 8, ¶ 87); plaintiffs' testimony at their "[examinations under oath] and depositions that . . . Delgado[] recommended that they schedule [Mrs. Fernando]'s engagement ring on" the Arbella policy (Docket Entry # 53, p. 18, ¶ 88); see (Docket Entry # 54-9, pp. 58-59) (Docket Entry # 54-10, p. 87) (Docket Entry # 54-33, pp. 225-26) (Docket Entry # 64, p. 9, ¶ 88); Arbella's investigatory findings in two reports (Docket Entry # 54-37) prepared by Seger (Docket Entry # 53, p. 22, ¶¶ 113-14) (Docket Entry # 64, pp. 11-12, ¶¶ 113-14), who Arbella had contracted to investigate Mr. Fernando's claim

under the Arbella policy; Amir Youshaie's deposition testimony
regarding his interactions with Mr. Fernando about the appraisals
(Docket Entry # 53, p. 26, ¶¶ 136, 138); see (Docket Entry # 54-
44, pp. 64, 79) (Docket Entry # 64, p. 14, ¶¶ 136, 138); Amir
Youshaie's deposition testimony "that the Gemological Institute
of America issues guidance with regard to diamond pricing"
(Docket Entry # 53, p. 26, ¶ 141); see (Docket Entry # 54-27, pp.
66-67) (Docket Entry # 64, p. 15, ¶ 141); CoventBridge's
reporting as to its conversations with Damitri De Silva, "the
niece of Ira and Neville" Fernando, and its investigatory
findings (Docket Entry # 53, p. 32, ¶¶ 178-80); see (Docket Entry
# 54-50) (Docket Entry # 64, pp. 17-18, ¶¶ 178-80).

The burden is on defendant "to show that the material" it
cites in support of its motion for summary judgment (Docket
Entry # 51) "is admissible as presented or to explain the
admissible form that is anticipated."  Fed. R. Civ. P. 56
advisory committee notes.  "[H]earsay evidence is inadmissible
unless one of the exceptions to the hearsay rule applies."
Integrated Commc'ns & Techs., Inc. v. Hewlett-Packard Fin.
Servs. Co., 478 F. Supp. 3d 126, 131 (D. Mass. 2020); see also
Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) ("'It is black-
letter law that hearsay evidence cannot be considered on summary
judgment' for the truth of the matter asserted." (citation
omitted)); Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir.

1990) ("Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment."). "The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." Jones v. UPS Ground Freight, 683 F.3d 1283, 1293 (11th Cir. 2012); see also Humphreys & Partners Architects, L.P. v. Lessard Design, Inc., 790 F.3d 532, 538-39 (4th Cir. 2015).

### 1.  Plaintiffs' Own Statements

Plaintiffs' own statements made during their recorded interviews (Docket Entry ## 54-15, 54-16, 54-17), examinations under oath (Docket Entry ## 54-9, 54-10), and depositions (Docket Entry ## 54-22, 54-23, 54-33) are admissible on summary judgment. See Fed. R. Civ. 32(a)(1); Fed. R. Civ. 56; Hannon, 645 F.3d at 49. Both plaintiffs would be present at trial to testify as to their prior statements. See (Docket Entry # 65, p. 12). As noted by defendant, "[p]laintiffs' prior recorded statements and [examinations under oath] . . . are not hearsay and are admissible under [Fed. R. Evid.] 801(d)(2)." (Docket Entry # 65, p. 12); see Fed. R. Evid. 801(d)(2) (providing that a statement "offered against an opposing party" is not hearsay when, inter alia, it "was made by the party in an individual or representative capacity").

2.   Rider's SIU Reports and Claim Note

Defendant argues that "[]Rider's SIU Report No. 1" (Docket Entry # 54-12), which "memorializes her investigative actions," is admissible under Fed. R. Evid. 803(6) ("Rule 803(6)") as a record of regularly conducted activity.  (Docket Entry # 65, pp. 6-7).  Under Rule 803(6), "[a] record of an act, event, condition, opinion, or diagnosis" is admissible as an exception to the hearsay rule if:

> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling . . .;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with [Federal] Rule [of Evidence] 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).  According to defendant, SIU Report No. 1 is "[c]onsistent with the requirements of [Rule] 803(6)" because it was "made at or near the time of its creation – or from information transmitted by – someone with knowledge of the content."  (Docket Entry # 65, p. 7).  More specifically, SIU Report No. 1: (1) "is dated April 22, 2016" and Rider's

"investigative actions" detailed therein were "from March 24, 2016 through April 20, 2016"; and (2) was authored by Rider and "contains a memorialization of [] Rider's own conduct, and her own investigative efforts, and is thereby made by someone with knowledge." (Docket Entry # 65, p. 7). Defendant also notes that Rider "would testify that she was the special investigator for Federal charged with investigating [] [p]laintiffs' claim" and that "she authored SIU Report No. 1 in the regular course of Federal's business (in the course of investigating a claim for insurance coverage) and that SIU Report No. 1 was prepared to memorialize her investigative efforts as required by Federal's practices and consistent with Federal's ordinary course of business." (Docket Entry # 65, p. 7).

However, SIU Report No. 1 (Docket Entry # 54-12) also memorializes her conversations with Sergeant Mosher, Leitch, Spencer, and David Youshaie, which poses a "hearsay within hearsay" issue. See EMK, Inc. v. Fed. Pac. Elec. Co., 677 F. Supp. 2d 334, 337 (D. Me. 2010) (5 Joseph M. McLaughlin, Jack B. Weinstein, Margaret A. Berger, Weinstein's Federal Evidence § 803.10[4][a] (2d ed. 2009) (Weinstein)) ("Statements by third persons that are recorded in an investigative report are hearsay within hearsay."). Accordingly, statements purportedly made by Sergeant Mosher, Leitch, Spencer, and David Youshaie and included in SIU Report No. 1 "are inadmissible unless they

qualify for their own exclusion or exception from the hearsay rule, e.g., as party admissions or as qualifying under some other hearsay exception."  See id.; see also Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").  To that end, defendant maintains that Sergeant Mosher, Leitch, and Spencer "would be called by Federal to testify at trial."  (Docket Entry # 65, pp. 8-9); see Jones, 683 F.3d at 1293 ("The most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial."); see also Humphreys, 790 F.3d at 538-39.

As for David Youshaie's statements in SIU Report No. 1, defendant alleges that his statements "concerning his preparation of the appraisals . . . would be admissible as statements against interest under" Fed. R. Evid. 804(b)(3). (Docket Entry # 65, pp. 8-9).  In a civil case such as this one, a "statement against interest" is a statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability."  Fed. R. Evid. 804(b)(3).  Because "David

36

Youshaie is a convicted felon prohibited from performing jewelry appraisals by the terms of his probation," defendant argues that "his statements to Ms. Rider that he performed the appraisals . . . , that he took the photographs attached to the appraisal[s] then subsequently dropped his phone in the toilet losing the photos . . . , and that he reviewed documentation in preparing the appraisals . . . , would all result in his admitting to a violation of his probation" and therefore "amount to statements against his penal interests."   (Docket Entry # 65, p. 9).

This court agrees that Rider's investigative findings in SIU Report No. 1 would be admissible at trial and therefore may be considered on summary judgment because: SIU Report No. 1 "was made at or near the time by--or from information transmitted by--someone with knowledge" as to its contents (Rider) and in the course of defendant's regularly conducted business activity; defendant represents that it would call Rider, Sergeant Mosher, Leitch, and Spencer to testify as to their statements in SIU Report No. 1; statements made by David Youshaie as to his performance of the appraisals would be admissible as a statement against interest under Fed. R. Evid. 804(b)(3); and plaintiffs have not "show[n] that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."   See Fed. R. Evid. 803(6); Ocasio-Hernandez, 777 F.3d at 4-5.

"For the same reasons discussed above as to SIU Report No.
1," defendant argues that "SIU Report No. 4 [Docket Entry # 54-
31] . . . will be admissible under [Rule] 803(6) as a business
record." (Docket Entry # 65, p. 8). Defendant represents that
Rider, Leitch, and Spencer "would be called by Federal to
testify at trial" and therefore "the substance of []Rider's
interactions with these two individuals [as detailed in SIU
Report No. 4] would be admissible at trial in the form of their
live testimony." (Docket Entry # 65, p. 8). This court finds
SIU Report No. 4 (Docket Entry # 54-31) to be admissible on
summary judgment for the reasons discussed with respect to SIU
Report No. 1.

"For the same reasons discussed [by defendant] as to SIU
Report No. 1" and No. 4, defendant argues that Rider's "March
30, 2016 file note (Docket Entry # 54-13) will be admissible
under the business record exception to hearsay," Fed. R. Evid.
803(6). (Docket Entry # 64, pp. 7-8). Rider's file note
essentially mirrors the conversation with Sergeant Mosher
reported in SIU Report No. 1. See generally (Docket Entry ##
54-12, 54-13). Defendant represents that "[]Rider would
similarly testify that she prepared the claim note based on her
personal knowledge and in the ordinary course of her employment
with Federal." For the reasons noted above with respect to SIU
Report No. 1 (Docket Entry # 54-12), this court finds Rider's

March 30, 2016 file note (Docket Entry # 54-21) admissible on summary judgment.

    3.  <u>CoventBridge's Report</u>

    Plaintiffs argue that CoventBridge's reporting (Docket Entry # 54-50) as to its attempts to contact the relatives of Mr. Fernando and his parents, its conversations with the niece of Mr. Fernando's parents, and its investigatory findings are inadmissible hearsay.  (Docket Entry # 64, pp. 18-19, ¶¶ 178-80); <u>see</u> (Docket Entry # 53, p. 32, ¶¶ 178-80).  Plaintiffs also argue that CoventBridge's opinions as to plaintiffs' claim is "expert opinion" that "is not a statement of fact" admissible on summary judgment.  (Docket Entry # 64, pp. 18-19, ¶¶ 176, 181-182, 187).  Defendant denies that CoventBridge's investigative reports qualify as expert reports and argues that they "are admissible as business records under [Rule] 803(6)."  (Docket Entry # 65, p. 15, n. 7).  Defendant, however, does not elaborate as to exactly how the reports are admissible under Rule 803(6).  <u>See generally</u> (Docket Entry # 65).  Additionally, defendant argues that, "[t]o the extent that that individuals located in Sri Lanka, whose statements are memorialized in the CoventBridge reports, may not be available to testify at trial, their statements to CoventBridge would be admissible as statements of personal or family history" under Fed. R. Evid. 804(b)(4)(B).  (Docket Entry # 65, p. 15, n. 7).  Defendant also does not elaborate as to how

Fed. R. Evid. 804(b)(4)(B) applies here.  For these reasons, this court will not admit the CoventBridge report (Docket Entry # 54-50) as admissible evidence on summary judgment.  See Fed. R. Civ. P. 56 advisory committee notes ("The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.").

### 4.   Examination-Under-Oath and Deposition Testimonies of Mr. Fernando's Parents

The examination-under-oath and deposition testimonies of Mr. Fernando's parents are proper evidence offered in support of summary judgment.  See Fed. R. Civ. P. 56 (providing that a party support a fact on summary judgment by citing to depositions and other materials); Hannon, 645 F.3d 45, 49 (1st Cir. 2011).  Defendant represents that "[b]oth Neville and Ira Fernando would be called at witnesses at trial and would testify as to the substance of [the] facts [in their examinations under oath and depositions,] rendering them in an admissible form."  (Docket Entry # 65, p. 15).  To the extent they testify at trial in a manner inconsistent with their examination-under-oath and deposition testimonies, their prior deposition statements would be admissible under Fed. R. Civ. 32(a)(2) and Fed. R. Evid. 613, and their examination-under-oath statements would be admissible under Fed. R. Evid. 801(d)(1) and Fed. R. Evid. 613 for impeachment purposes.  See Fed. R. Civ. 32(a)(2) ("Any party may

use a deposition to contradict or impeach the testimony given by the deponent as a witness, or for any other purpose allowed by the Federal Rules of Evidence."); Fed. R. Evid. 613 ("Extrinsic evidence of a witness's prior inconsistent statement is admissible [] if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires."); Fed. R. Evid. 801(d)(1) (providing that a statement is not hearsay when "[t]he declarant testifies and is subject to cross-examination about a prior statement" and the statement "is inconsistent with the declarant's testimony and was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition."); see also Fed. R. Civ. P. 56; Hannon, 645 F.3d at 49.  For these reasons, this court agrees with defendant that the examination-under-oath and deposition testimonies of Mr. Fernando's parents as to the provenance of the jewelry at issue are admissible on summary judgment.  (Docket Entry # 65, pp. 14-15).

   B.   Bankruptcy Filings of
        Plaintiffs and Mr. Fernando's Parents

   Defendant introduces the 2011 bankruptcy filings of plaintiffs (Docket Entry ## 54-52, 54-54) and Mr. Fernando's parents (Docket Entry # 54-53) as evidence that plaintiffs made misrepresentations during its investigation.  See (Docket Entry

# 52, pp. 18-19).  According to defendant, Mr. Fernando's bankruptcy filing is significant because, "[i]n his January 2011 bankruptcy filing, [Mr. Fernando] represented that he had $25.000 in 'cash on hand' and $25.000 on a 'prepaid card used as a checking account'" but represented to Federal during its investigation and his deposition that he purchased Mrs. Fernando's engagement ring in early 2011 for about $24,000.00 in cash with a $23,000 loan from his parents and a $2,000 loan from a friend.  (Docket Entry # 52, pp. 18-19); see (Docket Entry # 54-9, p. 68-71) (Docket Entry # 54-16, p. 47) (Docket Entry # 52).  Thus, despite being obligated to "disclose any income from sources, other than employment, received during the two years preceding the filing of his bankruptcy case" and "to disclose all unsecured creditors in his bankruptcy filing," Mr. Fernando did not disclose his receipt of the $25,000 "to the Bankruptcy Court either as income or debt."  (Docket Entry # 52, p. 18).  Similarly, "[j]ust after supposedly giving or loaning [Mr. Fernando] $23,000 in cash" and "[d]espite being required to disclose all gifts made within one year of filing their bankruptcy petition, as well as any transfers of property within two years preceding their filing, and any debts owed to them," Mr. Fernando's parents did not disclose their $23,000 gift or loan in their bankruptcy filings.  (Docket Entry # 52, p. 19); see (Docket Entry # 54-53).  Finally, Mrs. Fernando did not

declare her engagement ring on the schedule of personal property
in her bankruptcy filing, at which point "[Mr. Fernando] had
already given [her] the engagement ring."  (Docket Entry # 52,
p. 19); see (Docket Entry # 54-54).

Plaintiffs object to the admissibility of their prior
bankruptcy filings, as well as those of Mr. Fernando's parents.
(Docket Entry # 63, p. 14).  In support of this argument,
plaintiffs cite to In re Plourde, a bankruptcy decision which
they allege stands for the proposition that "bankruptcy schedules
are not admissible as an admission against the objecting party."
(Docket Entry # 63, p. 14); see In re Plourde, 397 B.R. 207, 218
(Bankr. D.N.H. 2008), aff'd in part, rev'd in part, 418 B.R. 495
(B.A.P. 1st Cir. 2009).  However, as defendant notes, plaintiffs
"mischaracterize the holding in that case, which more accurately
states, '[w]hen the objecting party is the trustee, the
bankruptcy schedules are not admissible as an admission against
the trustee, but may be admissible under the residual exception
in [Fed. R. Evid. 807] . . . .'"  In re Plourde, 397 B.R. at 221.
As such, In Re Plourde is not applicable here.

Additionally, as defendant also notes, "federal courts may
take judicial notice of proceedings in other courts if those
proceedings have relevance to the matter at hand."  (Docket
Entry # 65, p. 19, n. 8); see also Smith v. Grondolsky, 299 F.
Supp. 3d 287, 290 (D. Mass. 2018), aff'd, No. 18-1316, 2019 WL

10378245 (1st Cir. Sept. 4, 2019) ("[T]his court can and does take judicial notice of the docket of other courts."). Plaintiffs' bankruptcy statements are also admissible as opposing-party statements under Fed. R. Evid. 801(d)(2).  See Fed. R. Evid. 801(d)(2) (providing that a statement "offered against an opposing party" is not hearsay when, inter alia, it "was made by the party in an individual or representative capacity").  Finally, as indicated in In re Plourde, the bankruptcy filings of plaintiffs and Mr. Fernando's parents are admissible under the "residual exception" of Fed. R. Evid. 807 as a statement with sufficient guarantees of trustworthiness. See In re Plourde, 397 B.R. at 221; Fed. R. Evid. 807(a) (providing that a hearsay statement is admissible, "even if . . . not admissible under a hearsay exception in [Fed. R. Evid.] 803 or 804," when "supported by sufficient guarantees of trustworthiness" and "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts").  Plaintiffs and Mr. Fernando's bankruptcy filings were signed under oath for federal court proceedings and plaintiffs have not "question[ed] the accuracy" of the filings.  See In re Plourde, 397 B.R. at 227.  As to the probative value of the filings, defendant maintains that "there is no other more probative evidence demonstrating [] [p]laintiffs' misrepresentations regarding their ownership of

the engagement ring and the funds used to purchase the ring,
than the contradictions between the statement in their
bankruptcy filings and their representations to Federal."
(Docket Entry # 65, p. 20).  For these reasons, the bankruptcy
filings of plaintiffs and Mr. Fernando's parents are admissible
in this action to support defendant's argument that plaintiffs
made misrepresentations during its investigation.

    C.   Defendant's Expert Witness Reports

    Pursuant to Fed. R. Civ. 26(a)(2), defendant has
identified two expert witnesses in this case: James Whitaker
("Whitaker") and Donna DePrisco ("DePrisco").  (Docket Entry #
44) (Docket Entry # 54-27, pp. 1-2).  According to defendant,
"[]Whitaker has extensive experience with insurance claim
handling and claim investigation procedures and best practices"
and DePrisco is a "jewelry appraiser" with "extensive
experience in the fine jewelry and diamond industry" and a
certification "in diamonds by the Gemological Institute."
(Docket Entry # 44) (Docket Entry # 54-27, pp. 1-2).  Defendant
filed copies of Whitaker and DePrisco's written reports, which
details their qualifications and findings.  See generally
(Docket Entry # 44) (Docket Entry # 54-27).

    1.   Expert Report of James Whitaker

    Federal retained Whitaker to evaluate Federal's
investigation and denial of plaintiffs' claim.  (Docket Entry #

54-27, pp. 6-7).  Whitaker is a "certified fraud examiner,"
"certified protection professional," and "professional certified
investigator."  (Docket Entry # 54-27, p. 16) (capitalization
altered).  Based on his "review of the relevant case file
materials," he opined that that defendant "conducted a thorough
investigation; adhered to proper SIU protocols, encouraged and
allowed the insureds to provide any and all evidence in support
of their claim; and reached [its] conclusion to deny the claim
only after an exhaustive, fair and good faith investigation."
(Docket Entry # 54-27, p. 12).  He found that defendant "had
ample reason and in fact, an obligation, to continue
investigating th[e] claim based upon the lack of, and at times
conflicting information, received from" plaintiffs and Mr.
Fernando's father "during their initial statements and later
during their" examinations under oath.  (Docket Entry # 54-27,
p. 11).  Whitaker based his conclusion on, inter alia, the
following "key points and issues": plaintiffs' delayed reporting
of the loss to the police; "[t]he validity and suspicious nature
of the appraisals"; plaintiff's failure to produce a complete
copy of the security video allegedly showing the burglary; the
conflicting testimony provided by plaintiffs and Mr. Fernando's
father as to the jewelry's origins; conflicting statements by
Mr. Fernando and his father regarding the gifting of the
jewelry; Mr. Fernando's inability to identify where he purchased

Mrs. Fernando's engagement ring and the lack of credible evidence concerning the source of the funds used to purchase the engagement ring.  (Docket Entry # 54-27, p. 11).

Plaintiffs argue that: "[w]hether or not Federal's denial of the claim was 'reasonable', [sic] or the investigation thereof was 'conducted in good faith'", [sic] is a question for a jury."  (Docket Entry # 63, p. 15).  In addition, plaintiffs contend that defendant's determination "that [its] activities were 'reasonable' and performed 'in good faith' . . . relies exclusively on the conclusory opinions of Whitaker," plaintiffs further argue."  (Docket Entry # 63, p. 15).  Because defendant "provide no basis or foundation to [Whitaker's] conclusions . . . in [its] [m]emorandum of [l]aw or [s]tatements of [f]act," plaintiffs insist that this court cannot give any weight to his opinions "[]Whitaker's opinions can only be properly before a jury trial to weigh his experience and opinion."  (Docket Entry # 63, p. 15); see generally (Docket Entry ## 52, 53).

Defendant denies that it "failed to set forth [Whitaker's] qualifications" and points to his "extensive qualifications in the insurance industry and law enforcement [as] set forth in his expert report," which defendant "provided as an exhibit to [its] motion" for summary judgment.  (Docket Entry # 65, p. 18); see (Docket Entry # 54-27, pp. 6-7).  Whitaker also detailed in his report, defendant notes, "the documents that he reviewed and the

facts and rationale that serve as the basis for his
conclusions." (Docket Entry # 65, p. 18). Defendant also
"reiterate[s] [that], in order to preclude consideration of
evidence submitted for or against summary judgment, the
objecting party [here, plaintiffs] must show that the evidence
'cannot be presented in a form that would be admissible in
evidence.'" (Docket Entry # 65, p. 15) (quoting Fed. R. Civ. P.
56(c)(2)). To that end, defendant suggests that Whitaker would
"appear at trial and testify to [the] opinions" he set forth in
his report. See (Docket Entry # 65, p. 15) ("Because experts
could appear at trial and testify to opinions, an expert report
submitted for purposes of summary judgment meets the
requirements of [Fed. R. Civ. P.] 56 (c)"). For these reasons,
defendant maintains that "[h]is opinions are anything but
conclusory and satisfy the requirements of Fed. R. Civ. P. 56(c)
and (e) as proper evidence submitted in support of summary
judgment." (Docket Entry # 65, p. 18).

> 2.   Expert Report of Donna DePrisco

Defendant retained DePrisco to evaluate the seven
"appraisals prepared by Victoria / Paz Jewelers." (Docket Entry
# 54-27, p. 19). She opined that the appraisals: (1) "are
unprofessional in appearance, lack consistency and lack specific
features commonly found in jewelry appraisals"; and (2) "are
substantively inaccurate" in "substance and pricing," "with the

exception of the Rolex watch" (because she did "not offer an opinion" as to its value).  (Docket Entry # 54-27, p. 19). DePrisco's conclusions are based on her review of: the appraisals; the deposition testimony of Mr. Fernando, Delgado, and Amir Youshaie; and "the relevant Rapaport Diamond Report(s)," which she described as "the international standard for the pricing of diamonds based on color, cut, clarity and fluorescence."  (Docket Entry # 54-27, p. 19).

DePrisco shared the following findings in her report: the appraisals did not price the "diamond rings and bracelets . . . in a manner consistent with the values set forth in then applicable Rapaport Diamond Report(s)"; "[t]he verbiage used in the appraisals describing 'appraised price' is also not consistent with industry standards," as "[p]rofessional appraisals much more commonly describe the item's value as the 'retail value', [sic] 'fair market value' or 'replacement value'"; the appraisals lack "significant information commonly found on a professional jewelry appraisal, such as "a seal from the Gemological Institute of America" or, alternatively, "the appraiser's qualifications"; and "the appraisals lack consistency and critical descriptors[19] of each of the involved

---

[19]  The missing descriptors are: "consistent millimeter measures and cut grade descriptions"; detailed descriptions of "the settings and mountings"; and "a determination and confirmation

diamonds." (Docket Entry # 54-27, p. 21).  She also noted that "the vast majority of the diamonds on the appraisals are described as having exceptionally high [clarity and color] ratings," despite the fact that diamonds of such ratings "make up less than 3 % of the diamonds in the world." (Docket Entry # 54-27, p. 21).  According to DePrisco, it "is highly unlikely" to "find [that] many diamonds of this highest possible rating in the possession of a single owner." (Docket Entry # 54-27, p. 21).

Also notable to DePrisco was the fact that "Amir Youshaie, the individual who [according to plaintiffs] performed the appraisals and assigned the diamonds with these high rare ratings, could not even define a 'VVSI' rating accurately during his deposition"[20] and "did not know the diamond grading scale during his deposition," which "is something any appraiser, even with minimum experience, would be able to recite readily." (Docket Entry # 54-27, p. 21).  Because of the rare clarity rating assigned to the diamonds, DePrisco opined that "[e]ven the most knowledgeable and experienced certified graduate gemologist would rely on the use of a gemscope to confirm" such

_____

of the karat of the involved mountings and settings." (Docket Entry # 54-27, p. 21).
[20] According to DePrisco, "VVSI" is a "very rare and near the highest possible clarity rating[]" for diamonds. (Docket Entry # 54-27, p. 21).

rating.  (Docket Entry # 54-27, p. 21).  During Amir Youshaie's

deposition, however, DePrisco highlighted, he "could not

describe the proper usage of commonly used equipment."  (Docket

Entry # 54-27, p. 21).  Finally, she found it "noteworthy" that

Mr. Fernando "testified at his deposition that he dropped off

each of the items to be appraised and returned, often days

later, to retrieve the items" but that "Amir Youshaie testified

that he performed each of the appraisals on the spot with [Mr.

Fernando] waiting."  (Docket Entry # 54-27, p. 22).

Plaintiffs argue that: (1) they are "entitled to a

Daubert/Lanigan hearing as to"[21] DePrisco's qualifications; and

(2) DePrisco's opinions in her expert witness report (Docket

Entry # 54-27, pp. 19-22) are not facts and therefore not

"worthy of [s]ummary [j]udgment."  (Docket Entry # 63, p. 11).

Plaintiffs point to one of defendant's statement of facts as

representative of how "her entire testimony . . . must be given

no weight": "'[t]he manner in which the appraisals were

conducted, as described by Amir Youshaie, is not consistent with

industry standards.'"  (Docket Entry # 63, p. 11) (quoting

(Docket Entry # 53, p. 29, ¶ 157)).  "This opinion is not a fact

---

[21]  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)
("Daubert") (establishing evidentiary standard for admission of
expert testimony); Com. v. Lanigan, 641 N.E.2d 1342 (Mass. 1994)
(adopting Daubert standard as the evidentiary law of
Massachusetts).

worthy of [s]ummary [j]udgment," plaintiffs argue, because
"[d]efendant does not define industry standards" or present
DePrisco's "qualifications and foundation for her opinions" in
its "[s]tatements of [f]act or [m]emorandum of [l]aw."  (Docket
Entry # 63, p. 11); see generally (Docket Entry ## 52, 53).

     Even if DePrisco's opinions that the appraisals were
"inaccurate and unreliable" is true, plaintiffs continue, "that
is immaterial."  (Docket Entry # 63, p. 12).  Plaintiffs further
argue:

>     Unless [] [d]efendant could demonstrate as a fact that
>     [the]   [a]ppraisals   were   intentionally   performed
>     negligently, for the express purpose of the Plaintiffs
>     committing insurance fraud – which of course, they
>     cannot – this argument and request for a [c]ourt to find
>     as such in [d]efendant's papers has no weight.   []
>     Defendant does not state this as a [f]act, but asks the
>     [c]ourt to infer that this is a [f]act. This is, of
>     course, improper for purposes of a [s]ummary [j]udgment.

For these reasons, plaintiffs conclude that "the worthiness of
the [a]ppraisals and opinions of . . . DePrisco[] are genuine
issues of material fact" that cannot be resolved at the summary
judgment stage.  (Docket Entry # 63, p. 12).

     In response, defendant suggests that DePrisco would testify
a trial as to the opinions in her report.  See (Docket Entry #
65, p. 15) ("Because experts could appear at trial and testify to
opinions, an expert report submitted for purposes of summary
judgment meets the requirements of [Fed. R. Civ. P.] 56 (c)").
Defendant also argues that "[p]laintiffs completely ignore the

three paragraphs of extensive qualifications set forth at the
outset of [] DePrisco's report" (Docket Entry # 54-27, pp. 19-
20).  (Docket Entry # 65, p. 16).  Defendant highlights
DePrisco's experience "[a]s set forth in her report": she "has
over 40 years' experience in the jewelry industry"; "is certified
in diamonds by the Gemological Institute of America"; and "has
performed jewelry appraisals in various contexts for over forty
(40) years, including serving as appraiser for the Massachusetts
Attorney General, the State Treasurer, the Federal Bureau of
Investigation, and several police departments."  (Docket Entry #
65, p. 16); see (Docket Entry # 54-27, pp. 19-20).

     According to defendant, plaintiffs also ignore DePrisco's
inclusion of the "the relevant facts in this case on which
[DePrisco] relied in forming her opinions."  (Docket Entry # 65,
p. 17).  As noted previously, DePrisco noted in her report that
her conclusions were based on her review of: the appraisals; the
deposition testimony of Mr. Fernando, Delgado, and Amir
Youshaie; and "the relevant Rapaport Diamond Report(s)," which
are "the international standard for the pricing of diamonds
based on color, cut, clarity and fluorescence."  (Docket Entry #
54-27, p. 19).

     Because of DePrisco's qualifications and experience,
defendant denies that plaintiffs are entitled to a Daubert
hearing.  (Docket Entry # 65, p. 16).  In support of this

argument, defendant points to "the Advisory Committee Notes to the 2000 Amendments to [Fed. R. Evid.] 702," which "noted that '[the] amendment is not intended to provide an excuse for an automatic challenge to the testimony of every expert'" and that "'[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.'" (Docket Entry # 65, p. 16) (citation omitted).  According to defendant, "[]DePrisco's extensive experience in the jewelry industry," as highlighted previously, "speaks for itself." (Docket Entry # 65, p. 16).

Based on the foregoing, this court did not consider defendant's expert reports for the purposes of this memorandum and order on defendant's motion for summary judgment (Docket Entry # 52).  This court has, as previously noted, determined that material issues of fact exist precluding summary judgment. Additionally, this court finds that the designated expert witnesses' qualifications and admissibility of their reports are questions best suited for a Daubert hearing and further motion practice.  See Daubert, 509 U.S. at 592-93.

III. Defendant's Counterclaims

Because this court concludes that summary judgment is not appropriate for plaintiffs' claims, so too is summary judgment inappropriate for defendant's counterclaims (Docket Entry # 29, 16-21), which rely on the same disputed facts.  See Fed. R. Civ.

P. 56; Pierce, 741 F.3d at, 301.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Docket Entry # 51) is **DENIED.**

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge